IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southpointe Medical Associates, L.P.,     :
    :
          Appellant    :   No. 247 C.D. 2020
    :   No. 248 C.D. 2020
       v.                   :   No. 268 C.D. 2020
    :   Argued: May 13, 2021
Board of Supervisors for Township of    :
Cecil, Pennsylvania     :

BEFORE:    HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE ELLEN CEISLER, Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WOJCIK                             FILED: July 13, 2021

In these consolidated appeals, Southpointe Medical Associates, L.P. (Applicant) appeals the order of the Washington County Court of Common Pleas (trial court) affirming the decisions of the Board of Supervisors (Board) for the Township of Cecil, Pennsylvania (Township), which denied Applicant's Preliminary Subdivision Application, Preliminary Site Plan Application, and Conditional Use Application. Through these applications, Applicant seeks to subdivide a 2.96-acre portion of a larger parcel owned by Southpointe Golf Club (Golf Club), in which Applicant has an equitable interest, and to construct a three-story, 45,000 square foot commercial building, the Hope Learning Center (Center), for the care and education of children with special needs. We affirm.

These consolidated appeals are the latest in a line of cases relating to the potential subdivision and development of a portion of the Golf Club's property.

*See Southpointe Golf Club, Inc. v. Southpointe Property Owners' Association, Inc.* (Pa. Cmwlth., No. 1420 C.D. 2019, filed May 7, 2021) (*Southpointe II*); *Southpointe Golf Club, Inc. v. Board of Supervisors of Cecil Township*, ___ A.3d ___ (Pa. Cmwlth., No. 148 C.D. 2020, filed February 19, 2021) (*Southpointe I*). As outlined in these prior cases, the Southpointe development consists of a 589-acre planned community of mixed uses in both North Strabane and Cecil Townships, Washington County (County). The Golf Club's property consists of 8 parcels totaling 188 acres that is surrounded by 160 other parcels of mixed zoning classifications, all of which have been developed, including 3 industrial properties, 15 commercial properties, and 142 residential properties.

In 1989, the Redevelopment Authority of the County of Washington (Authority),[1] as "Declarant," executed a Declaration of Protective Covenants

---

[1] Section 9(h), (j), (k), (t), and (u) of the Urban Redevelopment Law (URL), Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §1709(h), (j), (k), (t) & (u) provides:

> An Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof, which powers shall include all powers necessary or appropriate to carry out and effectuate the purposes and provisions of this act, including the following powers in addition to those herein otherwise granted:
>
> * * *
>
> (h)    To assemble, purchase, obtain options upon, acquire by gift, grant, bequest, devise or otherwise any real . . . property or any interest therein from any person, firm, corporation, municipality or government[;]
>
> * * *
>
> (j)    To own, hold, clear, improve and manage real property;

**(Footnote continued on next page…)**

(Declaration) for the development, which was recorded on April 25, 1991.  As we have previously noted, Section 21.1(C) of the Declaration provides, in relevant part:

> Until the veto right . . . is specifically waived in writing by [the Authority], [the Authority] hereby expressly reserves the right to veto any or all of the following events and/or actions, and upon such veto, such vetoed events and/or actions shall be null and void:
>
> * * *
>
> C.    Attempted re[-]subdivision of the Property, or any part thereof[.]

*Southpointe II*, slip op. at 5.[2]

---

> (k)    To sell, lease or otherwise transfer any real property located outside of a redevelopment area and, subject to approval by the local governing body, any real property in a redevelopment area: Provided, That with respect to a redevelopment area the Authority finds that the sale, lease or other transfer of any part will not be prejudicial to the sale or lease of the other parts of the redevelopment area, nor be in any other way prejudicial to the realization of the redevelopment proposal approved by the governing body;
>
> * * *
>
> (t)    To make and execute contracts and other instruments necessary or convenient to the exercise of the powers of the Authority[; and]
>
> (u)    To make and from time to time to amend and repeal by-laws, rules, regulations and resolutions[.]

[2] Likewise, we observed that Section 5.2 of the Declaration states:

> For so long as [the Authority] owns the fee simple title to any Parcel in the Project, no Parcel shall be (i) platted (or re[-]platted) or subdivided (or re[-]subdivided) or (ii) combined with another Parcel for purposes of development, without the prior written approval of

**(Footnote continued on next page…)**

On April 30, 1991, the Authority conveyed 6 parcels in the development, totaling approximately 164 acres, to Millcraft Investments, Inc. (Millcraft).[3] On September 30, 1993, the Authority conveyed an 11-acre parcel and a 3.8-acre parcel to Millcraft. On January 14, 1994, Millcraft conveyed the foregoing property to the Golf Club. On June 18, 1996, the Authority conveyed an additional 7.9-acre parcel to the Golf Club.[4] *See Southpointe II*, slip op. at 6.

---

> the Authority which approval may be withheld in the sole and absolute discretion of the Authority.

*Southpointe II*, slip op. at 5 n.3.

[3] The deed conveying these parcels to Millcraft contained the following covenant:

> FIRST: The Grantee shall devote the property hereby conveyed only to the uses specified in the applicable provisions of the Zoning Ordinance of the [Township], as amended March 16, 1988, and the Western Center Redevelopment Plan.

*Southpointe II*, slip op. at 6 n.4. The 1993 deed conveying the additional two parcels by the Authority to Millcraft contains the same language. *See* Reproduced Record (R.R.) at 148a-149a.

[4] Section 5 of Part I of the Contract for Sale of Land for Private Redevelopment between the Authority and the Golf Club states:

> The covenant pertaining to the use of the Property, set forth in Section 401 hereof and in the [Declaration] as recorded in the Recorder of Deeds Office of the [County], shall remain in effect from the date of the Deed until January 1, 2010 the period specified or referred to in the Covenant, ***or until such date thereafter to which it may be extended by proper amendment of the Covenant***.

*Southpointe II*, slip op. at 6-7 n.5 (emphasis in original).

In turn, Section 401 of the Terms and Conditions in Part II of the Contract for Sale of Land for Private Redevelopment between the Authority and the Golf Club states:

> Restrictions on Use:

**(Footnote continued on next page…)**

On November 4, 2003, the Authority recorded a Waiver and Release of Veto Power Under Declarations of Protective Covenants (Waiver and Release), which states, in pertinent part, that it

> waives its veto rights set forth in the [Declaration] Section 21.1, <u>except</u> with regard to Parcels 11A, 11B, 11C, 11D, 11E, 11F, 11G and 11H, which include the golf club, golf course and lake, and for which and over which the Authority specifically excludes said waiver and release and will continue in the future to assert its veto rights under the [Declaration], Section 21.1(C) and reserves the right to enforce those rights at law and in equity.

*Southpointe II*, slip op. at 6 (emphasis in original).

Later that month, the Authority and the Southpointe Property Owners' Association, Inc. (Association) executed an Assignment of Declaration of Protective Covenants and Assumption of Obligations (Assignment) in which the Authority

---

> The Redeveloper agrees for itself, and its successors and assigns, and every successor in interest to the Property, or any part thereof, and the Deed shall contain covenants on the part of the Redeveloper for itself, and such successors and assigns, that the Redeveloper and such successors and assigns shall:
>
> a.      Devote the Property to, and only to and in accordance with, the uses specified in the Zoning Ordinance of the Township of Cecil as amended, March 16, 1988. . . .

*Id.* at 7 n.5.

Finally, Section 807 provides:

> None of the provisions of the Agreement are intended to or shall be merged by reason of any deed transferring title to the Property from the [Authority] to the Redeveloper or any successor in interest, and any such deed shall not be deemed to affect or impair the provisions and covenants of the Agreement.

*Id.* at 7-8 n.5.

5

assigned to the Association all of its "rights, title, interest, powers, obligations, easements[,] and estates" contained in the Declaration, except for the following:

> 8. [The Authority] hereby waives its rights under Section 21.1 of the [Declaration], as aforesaid, except that [the Authority] specifically excepts, reserves and retains the veto rights provided by Section 21.1(C) only as to the [Golf Club] (including, but not limited to, the clubhouse and all property used as part of the Southpointe Golf Club). . . .

*Southpointe II*, slip op. at 8-9.

In an October 12, 2015 letter, Horizon Properties Group, LLC (Horizon) notified the Authority of its intention to subdivide the Golf Club's property to develop the Center to which the Authority's solicitor responded, explaining that the Authority retained veto power over the subdivision of the Golf Club's property under the 2003 Waiver and Release and required timely notice of Horizon's intention to subdivide the property. *See Southpointe II*, slip op. at 9-10. The solicitor indicated that "[w]ithout more specific information," the Authority could not "commit to object or not object to any [Golf Club property] subdivision to accommodate that project." *Id.* As a result, the Authority asked Horizon to "provide any and all currently existing agreements, renderings, timelines, plans, specifications, etc. to allow [the Authority] to respond to [the] request." *Id.* at 10.

On November 16, 2015, the Golf Club filed an action under the Declaratory Judgments Act (DJA)[5] against the Authority and the Association. *Southpointe II*, slip op. at 10. The Golf Club then filed an Amended Complaint in which it asked the trial court to declare that the Authority's veto power precluding the subdivision of the Golf Club's property terminated as of January 1, 2010. *Id.*

---

[5] 42 Pa. C.S. §§7531-7541.

As this Court has noted, the Southpointe development constitutes the entirety of the Township's Special Development Zoning District (SD District) under its Unified Development Ordinance (UDO), which was enacted on May 17, 2005. *Southpointe I*, ___ A.3d at ___, slip op. at 2. From its inception and throughout much of its development, UDO Section 913.F permitted a property owner to change the use of a property located in the SD District by applying for a conditional use.[6] *Id.* Specifically, UDO Section 913.F states, in relevant part:

> **F.  EFFECT OF PROPOSED CHANGE OF LAND USE CATEGORY FOR INDIVIDUAL LOTS**
>
> 1.  Any proposed change in the land use category of a vacant lot or parcel in a recorded plan of subdivision shall be addressed as follows: The [Board] shall hold a public hearing to a[ss]ess the compatibility of the proposed change in land use, and further, to determine the need for reasonable and appropriate conditions and safeguards to protect the public health, safety, and welfare of adjacent properties within and outside of the SD development tract.
>
> 2.  Any proposed change in the land use category of a developed lot or parcel in a recorded plan of subdivision shall require the submission of a conditional use

---

[6] As the Board explained:

> The Township's UDO defines "conditional use" as "[a] use that would not be appropriate generally or without restrictions throughout the zoning district, but which, if controlled as to area, location, or relation to the neighborhood, would not be detrimental to public health, safety or general welfare. . . . Express standards and criteria are set forth in the specific zoning district. Additionally, the [Board] has the opportunity to thoroughly examine the proposal and to impose any other reasonable safeguards necessary to implement the intent of this Chapter and to protect the general welfare." UDO §202.

R.R. at 13a.

application proposing revision to the Illustrative Site Plan. If conditional use approval is granted, submission of a revised subdivision plan showing the new land use category shall be required for approval and recording. . . .

R.R. at 244a.

However, while the action under the DJA was pending, in May and September of 2016, the Board adopted Ordinance 1-2016 and Ordinance 11-2016, which amended UDO Section 913.F.2 to prevent Southpointe property owners from changing their property use to a less restrictive use classification as defined in those ordinances. *Southpointe I* at ___, slip op. at 2-9. On October 6, 2016, the Golf Club filed a procedural challenge to Ordinance 11-2016 in the trial court and a substantive validity challenge to Ordinance 11-2016 with the Township's Zoning Hearing Board (ZHB). *Id.* at ___, slip op. at 9-10. Before the ZHB, the Golf Club asserted, *inter alia*, that the ordinances singled out its property and effectively prohibited any change in its use, and unlawfully granted the Board discretion to waive the UDO requirements where an applicant submits a petition signed by 100% of the adjoining landowners consenting to a change in use. *Id.* at ___, slip op. at 10.[7]

---

[7] Ultimately, the trial court and the ZHB rejected the Golf Club's procedural and substantive validity challenges to Ordinance 11-2016. *See Southpointe I* at ___, slip op. at 10-12. On appeal to this Court, however, we held:

Ordinance 11-2016 places control over the [Board's] authority to waive applicable review standards for change of Land Use Category or Land Use applications into the hands of a nongovernmental body – the adjacent landowners. The Ordinance gives the adjacent property owners unfettered power to decide whether the [Board] will have the option of waiving the applicable review standards in considering a zoning application. Notably, this power is delegated to adjacent property owners *regardless of what use* [other than a golf course] *is being proposed*, and thus, regardless of whether the proposed use is consistent with the public health, safety, and welfare and the requirements of [the] Township's general zoning plan.

**(Footnote continued on next page…)**

8

Meanwhile, on May 5, 2016, Applicant filed the instant Preliminary Subdivision Application, Preliminary Site Plan Application, and Conditional Use Application seeking to subdivide the Golf Club's property and construct the 45,000 square foot commercial building to house the Center. On June 17, 2016, Applicant and the Township agreed to extend the time for hearings on the applications to give Applicant additional time to provide more information to the Township's Engineer.

The Board scheduled a hearing on Applicant's Conditional Use Application for August 1, 2016, and determined that the other applications would be considered and disposed of at its monthly meeting. At the hearing. Applicant requested another continuance because the Township had not given it a reasonable opportunity to address all of the Engineer's concerns, and that it was not prepared to put on its case. Nevertheless, the Board continued with the hearing and, receiving no evidence from Applicant, took public comment regarding the Conditional Use

---

> Furthermore, under Ordinance 11-2016, adjacent landowners have unbridled discretion to determine the rules under which a use application will be evaluated: a set of rules under which the [Board] can waive the applicable review standards for a change of use, or a set of rules under which it must strictly apply the ordinance. There are no "necessary safeguards to guide and restrain the exercise of the administrative functions delegated to the adjacent landowners to guard against any adjacent landowner's arbitrary or capricious decision to change the applicable zoning ordinance provision from one which requires adherence to review standards to one which gives the [Board] the option to waive such standards, or to restrict later revocation of such consent.

*Southpointe I* at ___, slip op. at 21-22 (citations omitted and emphasis in original). As a result, we determined that "this provision represents an impermissible delegation of zoning authority," and that "the trial court erred in denying [the] Golf Club's substantive validity challenge [to] Ordinance 11-2016." *Id.* at ___, slip op. at 22. Accordingly, we reversed the trial court's order and did not reach the Golf Club's claim regarding procedural deficiencies in Ordinance 11-2016's enactment. *Id.*

9

Application. Southpointe development residents stated objections concerning property devaluation, increased traffic congestion, disturbance of wetlands and wildlife, and the destruction of the character of their residential neighborhoods. R.R. at 167a-175a.

Additionally, Colin Fitch, the Authority's counsel, appeared at the hearing[8] and stated that on June 3, 2016, he sent a letter to both the Board and the Township's Planning Commission explaining that the Authority intended to exercise its veto power thereby precluding subdivision and development of the Golf Club's property. R.R. at 153a-154a. Fitch submitted the letter to the Board.[9] *Id.* at 154a. The letter states, in relevant part, that the Authority

> hereby exercises the veto power contained in the Declaration and Waiver and requests that the [Board] and Planning Commission honor said veto and declare the

---

[8] Counsel for the Association and three other homeowner's associations appeared in opposition to the applications. R.R. at 151a-153a, 159a-161a.

[9] Section 9(z) of the URL states:

> An Authority shall constitute a public body, corporate and politic, exercising public powers of the Commonwealth as an agency thereof, which powers shall include all powers necessary or appropriate to carry out and effectuate the purposes and provisions of this act, including the following powers in addition to those herein otherwise granted:
>
> * * *
>
> (z)     To make available to the government or municipality or any appropriate agency, board or commission, the recommendations of the Authority affecting any area in its field of operation or property therein, which it may deem likely to promote the public health, morals, safety or welfare.

35 P.S. §1709(z).

10

attempted subdivision and other applications null and void. [The Authority] and the [County] provided funding that assisted in the development of the golf course. The Arthur Hills-designed championship golf course was the "focal point" of [the Authority's] Southpointe project from its inception. [The Authority] retained the veto power in 2003 to assure the continued integrity of the course for the benefit of the Southpointe community into the future, not merely for twenty years after filing the Declaration.

[The Authority] requests that this letter be placed in the appropriate record before whatever [Township] bodies consider the applications filed by [Applicant].

*Id.* at 208a-209a.

Fitch also submitted to the Board a brochure that was prepared as part of the development of the Southpointe project to emphasize the importance of the golf course to the entire development. R.R. at 154a-155a, 189a-206a. He stated that the brochure

reflects the initial subdivision -- the initial site plan, anyway, of the entire Southpointe project. Which laid out the fact that the golf course was the focal point of the entire project. And the residential, the commercial was all geared around the golf course.

And that's the reason that the [Authority] feels strongly about not only the conditional use application, but also the subdivision application. That veto power is to maintain control over any re-subdivision of the golf course. And that's because it's important green space.

All of the properties were conveyed with the understanding that the golf course would be there not only for 20 years, but for in excess of 20 years. You don't build an Arthur Hills championship golf course and anticipate that it's only going to last for 20 years. And after 20 years it can be re-subdivided at a whim. That's why the [Authority] because of the importance of that golf course to the entire project and the fact that all of the parcels were

11

sold with the understanding that this was going to be an ongoing project with green space with a golf course. That's why it's important.

*Id.* at 155a-156a.

Fitch also noted that Section 913.C.5 of the Township's UDO[10] specifically incorporates the provisions of the URL into conditional use applications in the Township. R.R. at 156a. He explained that the Authority's retention of the veto power is authorized by Section 11(a)(9) of the URL, 35 P.S. §1711(a)(9). *Id.*

The Board closed the hearing, but indicated that the record would be kept open to receive written briefs, again denying Applicant's request to keep the record open for the reception of evidence. R.R. at 163a-167a, 170a-171a, 175a, 176a. On August 9, 2016, Applicant submitted materials in response to the Township Engineer's comments with a revised subdivision plan. *Id.* at 249a-299a, 303a-304a.

On September 6, 2016, at its monthly public hearing, the Board considered and denied all three of Applicant's applications. *See* R.R. at 301a-306a. That same day, the Board issued three written decisions denying the applications. *See id.* at 1a-28a. With respect to its denial of the Conditional Use Application,

---

[10] Section 913.C.5 of the UDO states:

> **C. STANDARDS FOR CONDITIONAL USE APPROVAL OF AN ILLUSTRATIVE SITE PLAN**
>
> * * *
>
> 5. The tract shall be subject to the redevelopment laws of the Commonwealth.

R.R. at 242a-243a.

citing UDO Section 913.F, URL Section 11(a)(9) and (b),[11] and Section 515.1 of the Pennsylvania Municipalities Planning Code (MPC),[12] the Board determined that

---

[11] Section 11(a)(9) and (b) of the URL provides, in pertinent part:

> (a) The contract between the Authority and a redeveloper shall contain, without being limited to, the following provisions:
>
> * * *
>
> (9) Such other continuing controls as may be deemed necessary to effectuate the purposes of this act[.]
>
> * * *
>
> (b) Any deed or lease to a redeveloper in furtherance of a redevelopment contract shall be executed in the name of the Authority . . . and shall contain in addition to all other provisions, such provisions as the Authority may deem desirable to run with the land in order to effectuate the purposes of this act[.]

35 P.S. §1711(a)(9), (b).

[12] Act of July 31, 1968, P.L. 805, *as amended*, added by the Act of December 21, 1988, P.L. 1329, 53 P.S. §10515.1. Section 515.1 states, in relevant part:

> (a) In addition to other remedies, the municipality may institute and maintain appropriate actions by law or in equity to restrain, correct or abate violations, to prevent unlawful construction, to recover damages and to prevent illegal occupancy of a building, structure or premises. . . .
>
> (b) A municipality may refuse to issue any permit or grant any approval necessary to further improve or develop any real property which has been developed or which has resulted from a subdivision of real property in violation of any ordinance adopted pursuant to this article. . . . As an additional condition for issuance of a permit or the granting of an approval to any such owner, current owner, vendee or lessee for the development of any such real property, the municipality may require compliance with the conditions that would

**(Footnote continued on next page…)**

Applicant's proposed change in land use category is subject to the Authority's veto. R.R. at 23a-24a. As a result, the Board concluded:

> 144. Applicant requires the Township's approval of its request to rezone the property from Residential to Commercial to proceed with the redevelopment project.
>
> 145. The SD District in question was approved subject to the redevelopment laws of the Commonwealth, including 35 P.S. §1711(a)(9) and 35 P.S. §1711(b).
>
> 146. The SD District in question was approved subject to the above-recited restrictive covenants, including the [Authority's] veto power over changes to the golf course.
>
> 147. As of this date, no court of competent jurisdiction has declared that the [Authority] has waived this veto power and/or that it no longer possesses any veto power relating to the golf course.
>
> 148. The [Authority] has put the Township on notice that it is exercising its veto power relating to the golf course.
>
> 149. The Township must deny the request for approval to change the land use category from Residential to Commercial because, *inter alia*, Applicant has not demonstrated that the [Authority] [h]as waived or otherwise lost its veto power over the golf course.
>
> 150. The Township must deny the request for approval to change the land use category from Residential to Commercial because, *inter alia*, the proposed change is in violation of the redevelopment laws of the Commonwealth. Section 913.C.5 of the UDO.

---

have been applicable to the property at the time the applicant acquired an interest in such real property.

53 P.S. §10515.1.

*Id.* at 24a-25a. The Board also determined that Applicant failed to sustain its burden of proof under Sections 403.F and 913.C of the UDO and Ordinance 1-2016, and that it did not err in denying Applicant's request for a continuance. *See id.* at 16a-23a.

Likewise, with respect to its denial of Applicant's Preliminary Subdivision Application[13] pursuant to UDO Section 504.C.2.e, URL Section 11(a)(9) and (b), and MPC Section 515.1, the Board concluded:

> 41.    The Deed from the [Authority] to the predecessor in title of [the Golf Club] stated that the Deed, "was subject to the restrictions contained in the [Declaration], recorded in Deed Book Volume 2446, page 477 of the Recorder's Office of Washington County, Pennsylvania."
>
> 42.    One of the "restrictions" was the [Authority's] reservation of a veto power over "any re[-]subdivision of the property or any part thereof."
>
> 43.    The Waiver and Assignment recited that the [Authority] retained its veto power [with] respect[] to any attempted subdivision of the golf course "will continue in

---

[13] Importantly, Section 504.B.4.d of the UDO states, in relevant part:

> 4.    [Board] Action on Preliminary Plan
>
> * * *
>
> d.    ***Approval of the preliminary plan shall constitute approval of the subdivision or land development as to the character and intensity of development,*** and the arrangement and approximate dimensions of streets, lots, and other planned features. The approval binds the subdivider or developer to the general scheme of the plan as approved, unless a revised preliminary plan is submitted, and permits the subdivider to proceed with final detailed design of improvements. . . .

R.R. at 230a (emphasis added).

15

the future to assert its veto rights under the [Declaration], Section 21.1(C) and reserves the right to enforce those rights at law and equity."

44.    The current owner of the golf course holds the golf course land subject to the above-stated restriction.

45.    The issue regarding whether the veto power has been waived is being litigated in the [trial court] via [the Golf Club's] Complaint in Equity Seeking Declaratory Judgment.

46.    Applicant needs the Township's approval of its request to rezone the property from Residential to Commercial to proceed with the redevelopment project.

47.    The SD District in question was approved subject to the redevelopment laws of the Commonwealth including 35 P.S. §1711(a)(9) and 35 P.S. §1711(b).

48.    The SD District in question was approved subject to the above-recited restrictive covenants, including the [Authority's] veto power over changes to the golf course.

49.    As of this date, no court of competent jurisdiction has declared that the [Authority] has waived this veto power and/or it no longer possesses any veto power relating to the golf course.

50.    The [Authority] has exercised its veto power over the subdivision.

51.    The veto power prohibits the proposed subdivision. See Section 504.C.2.e of the UDO.[14]

---

[14] Section 504.C.2.e of the UDO states, in relevant part:

2.    Supporting Material to be Filed with Final Plan

* * *

**(Footnote continued on next page…)**

R.R. at 8a-9a. The Board also denied the Preliminary Subdivision Application on the basis that "Applicant has not provided a copy of the dedicated easement from the [Authority] for [the] area for ingress, egress, regress[,] and utilities," or an Acknowledgement from the Authority "for grading in the easement" or "for work being proposed on [its] property. *See* Section 504.C.2.e of the UDO." R.R. at 6a. Additionally, the Board denied the application because "[a]pproval of the request to change a land use category is a prerequisite to subdivision consideration and approval," "[t]he Township denied Applicant's request to change [the] Land Use Category from Residential to Commercial," and "[a] Commercial Building is not permitted in a Residential Land Use Category." *Id.* at 7a.

Finally, with respect to its denial of Applicant's Site Plan Application, pursuant to UDO Section 504.C.2.e, the Board concluded that "Applicant has not provided a copy of the dedicated easement from the [Authority] for [the] area for ingress, egress, regress[,] and utilities," or an Acknowledgement from the Authority "for grading in the easement," or an "Acknowledgement from the Southpointe Rink Association, LP for work being proposed on [its] property." R.R. at 1a. The Board also concluded, pursuant to UDO Section 913, that "[t]he Township denied Applicant's request to change Land Use Category from Residential to Commercial," and "[a] Commercial Building is not permitted in a Residential Land Use Category." *Id.* at 2a. Moreover, the Board stated, "[t]o the extent applicable the Site Plan [A]pplication is denied for the reasons set forth in" its decision denying the Preliminary Subdivision Application. *Id.* Applicant subsequently appealed the

---

e.     A copy of final deed restrictions or protective covenants, and a copy of any and all proposed written easements or deeds to be granted. . . .

R.R. at 232a.

Board's decisions denying the foregoing applications to the trial court in which the appeals were consolidated, and then filed the instant appeal of the trial court's order affirming the Board's decisions, which were consolidated by this Court.

On appeal,[15] Applicant claims: (1) the Board erred in denying the Preliminary Subdivision Application and Preliminary Site Plan Application based on conditional use approval, final subdivision approval, and the Authority's power to veto subdivision where the preliminary subdivision and site plans complied with all requirements of the Township's UDO; and (2) the Board erred in denying the Conditional Use Application by relying on the invalid Ordinance 1-2016 and the speculative objector testimony where the application complied with the only objective criterion in the operative UDO Section 913.

However, during the pendency of the foregoing application proceedings, the trial court denied the requested relief in the DJA action seeking a declaration that the Authority's Declaration was ineffective and that the Authority did not have veto power to preclude subdivision and commercial development of the Golf Club's property, and we affirmed the trial court's order in *Southpointe II*. In our opinion, we stated the following, in relevant part:

> Section 10(a), (c)(9), and (i) of URL states, in pertinent part:
>
> > (a)   An Authority shall prepare a redevelopment proposal for all or part of any area certified by the planning commission to be a redevelopment area and for which the planning commission has made a redevelopment area plan.

---

[15] "In a land use appeal, where the trial court does not take additional evidence, this Court's scope of review is limited to determining whether the local governing body committed an error of law or abused its discretion." *Residents Against Matrix v. Lower Makefield Township*, 845 A.2d 908, 910 (Pa. Cmwlth. 2004) (citation omitted).

* * *

> (c) The planning commission's redevelopment area plan shall include, without being limited to, the following:

> * * *

> (9) A statement of such continuing controls as may be deemed necessary to effectuate the purposes of this act.

> * * *

> (i) Upon approval by the governing body of the redevelopment proposal, as submitted by the Authority, the Authority is authorized to take such action as may be necessary to carry it out.

35 P.S. §1710(a), (c)(9), & (i).

Likewise, Section 11(a)(9) of the URL provides, in relevant part:

> (a) The contract between the Authority and a redeveloper shall contain, without being limited to, the following provisions:

> * * *

> (9) Such other continuing controls as may be deemed necessary to effectuate the purposes of this act[.]

35 P.S. §1711(a)(9). As a result, as outlined above, Sections 9 and 11 of the URL specifically contemplate and empower the Authority to execute the relevant documents to impose the restrictive covenants in the Declaration and to retain its veto power as provided under Section 21.1(C) of the Declaration.

Furthermore, as outlined above, the Authority's power to act in any manner contravening the purposes of

19

the Southpointe development or the restrictive covenants, or prejudicing the rights of all of the property owners in the development, is severely circumscribed by Section 9(k) of the URL. *See* 35 P.S. §1709(k) ("Provided, That with respect to a redevelopment area the Authority finds that the sale, lease or other transfer of any part will not be prejudicial to the sale or lease of the other parts of the redevelopment area, nor be in any other way prejudicial to the realization of the redevelopment proposal approved by the governing body.").

*Southpointe II*, slip op. at 16-17 (footnote omitted). *See also* Section 11(b) of the URL, 35 P.S. §1711(b) ("Any deed . . . to a redeveloper in furtherance of a redevelopment contract shall be executed in the name of the Authority . . . and shall contain . . . such provisions as the Authority may deem desirable to run with the land in order to effectuate the purposes of this act[.]"); *In re Condemnation of Land for the South East Central Business District Redevelopment Area #1*, 946 A.2d 1143, 1146-47 (Pa. Cmwlth. 2008) ("Where an authority sells real property to a redeveloper in furtherance of a redevelopment contract, the deed shall contain such provisions as the authority may deem desirable to run with the land in order to effectuate the purposes of the [URL]. Section 11(b) of the [URL], 35 P.S. §1711(b)."). Accordingly, we concluded that "the trial court did not err or abuse its discretion in denying the requested declaratory relief" because "the trial court properly construed all of the provisions of the Declaration and all of the other relevant documents executed by the Authority so as to comply with the pertinent and controlling provisions of the Declaration, the [Uniform Planned Community Act, 68 Pa. C.S. §§5101-5414,] and the URL." *Southpointe II*, slip op. at 18.

In view of the foregoing, the Board properly denied the instant applications based on the Authority's invocation of its veto power precluding the subdivision of the Golf Club's property and any commercial development thereon.

20

As noted by the Board, UDO Section 913.C.5 specifically states that conditional use approval is limited so that "[t]he tract shall be subject to the redevelopment laws of the Commonwealth," R.R. at 242a-243a, thereby specifically incorporating the Authority's exercise of its powers conferred under the URL. Moreover, Section 9(z) of the URL specifically contemplates the Authority's participation in the Board's proceedings on the instant applications, to provide "recommendations . . . affecting any area in its field of operation or property therein, which it may deem likely to promote the public health, morals, safety or welfare." 35 P.S. §1709(z).[16] *See also* Section 508(2) of the MPC, 53 P.S. §10508(2) ("When the application is not approved in terms as filed the decision shall specify the defects found in the application and describe the requirements which have not been met and shall, in each case, cite to the provisions of the statute or ordinance relied upon.").

Additionally, as noted, Section 515.1(b) of the MPC empowers the Board to refuse to grant an application in violation of the foregoing provision of the UDO, or to make approval of Applicant's Conditional Use Application contingent upon the Authority's non-exercise of its subdivision veto power reserved under the URL. Specifically, the Board "may refuse to . . . grant any approval necessary to further improve or develop any real property which has been developed or which has resulted from a subdivision of real property in violation of any ordinance," and "[a]s an additional condition for . . . the granting of an approval . . . for the development of any such real property, the municipality may require compliance

---

[16] It is in this respect that the instant matter is distinguishable from the case law upon which Applicant relies, wherein the courts have held that "[a]n application for a subdivision plan which conforms to all the technical requirements of relevant ordinances cannot be denied based on deed restrictions. *Anderson v. Board of Supervisors of Price Township*, [437 A.2d 1308 (Pa. Cmwlth. 1981)]." *Gulla v. North Strabane Township*, 676 A.2d 709, 711 (Pa. Cmwlth. 1996), *aff'd per curiam*, 712 A.2d 281 (Pa. 1998).

21

with the conditions that would have been applicable to the property at the time the applicant acquired an interest in such real property." 53 P.S. §10515.1(b).

Moreover, Applicant failed to present any evidence to meet its initial burden of proof in support of the Conditional Use Application, and the Board's grant of the Preliminary Subdivision Application and the Preliminary Site Plan Application was dependent on the Board's grant of the Conditional Use Application under the original UDO Section 913.F.2 and UDO Section 405.C.1.[17] Indeed, as this Court has observed:

> [The MPC] provides that a zoning ordinance may contain "provisions for conditional uses to be allowed or denied by the governing body pursuant to public notice and hearing and recommendations by the planning agency and pursuant to express standards and criteria set forth in the zoning ordinances." Section 603(c)(2) of the MPC, 53 P.S. §10603(c)(2). A conditional use is nothing more than a special exception which falls within the jurisdiction of the municipal governing body rather than the zoning hearing board. As in the case of special exceptions, the uses which may be established or maintained as conditional uses are prescribed by the zoning ordinance and the standards to be applied to the granting or denial thereof are set forth in the zoning ordinance. A special exception is not an exception to the zoning ordinance, but rather a use to which the applicant is entitled provided the specific standards enumerated in the ordinance for the special exception are met by the applicant.
>
> Because the law regarding conditional uses and special exceptions is virtually identical, the burden of proof standards are the same for both. An applicant for conditional use has the burden to demonstrate compliance

---

[17] UDO Section 405.C.1 states that "[a]fter the subdivider or developer has received official notification from the [Board] that the preliminary plan has been approved, a final plan may be submitted in accordance with the provisions of Section 508 of the [MPC, 53 P.S. §10508]." R.R. at 230a.

with the specific criteria of the ordinance. Once the applicant meets the requirements, he has made out his *prima facie* case and the application must be granted unless the objectors present sufficient evidence that the proposed use has a detrimental effect on the public health, safety, and welfare.

Generally, satisfying the criteria for conditional use is just one step of the subdivision approval process. In fact, subdivision approval cannot be granted until the conditional use approval is first obtained. Special exception or conditional use proceedings involve only the proposed use of the land, and do not involve the particular details of the design of the proposed development.

What must be demonstrated in order to obtain conditional use approval must be determined on a case by case basis and will vary among municipalities based upon the use requested and the language in the ordinance. . . .

*In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006) (citations omitted).[18]

Even if it is assumed, as Applicant contends, that the Board abused its discretion in failing to grant a continuance of the Conditional Use Application hearing to permit Applicant to present evidence in support of its *prima facie* case,

---

[18] As this Court has also observed:

[A] governing body reviewing a final land use plan must determine if there are zoning issues. If zoning relief is required, *e.g.*, a variance or special exception, the applicant should apply to the zoning hearing board for such relief prior to seeking approval of a land use plan. Where the applicant does not follow that sequence and there are zoning issues, the governing body may, at most, issue a conditional approval that awaits the applicant first obtaining necessary zoning relief from the zoning hearing board.

*Montessori Regional Charter School v. Millcreek Township Board of Supervisors* (Pa. Cmwlth., No. 2468 C.D. 2015, filed September 16, 2016), slip op. at 8 (citation omitted). Although unreported panel decisions of this Court are not binding, they may be cited as persuasive authority pursuant to Pennsylvania Rule of Appellate Procedure 126(b), Pa. R.A.P. 126(b), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

Applicant does not allege that there is any evidence that could have been submitted to satisfy the requirements of UDO Section 913.C.5. As a result, any purported error by the Board in this regard is harmless.[19] In sum, the Board did not commit an error of law or abuse its discretion in denying the instant applications.

Accordingly, the trial court's order is affirmed.

_____
MICHAEL H. WOJCIK, Judge

Judge McCullough did not participate in the decision of this case.

---

[19] *See, e.g.*, *Pennsy Supply, Inc. v. Zoning Hearing Board of Dorrance Township*, 987 A.2d 1243, 1251 (Pa. Cmwlth. 2009) ("[T]he trial court's reference to [a case stating the incorrect burden of proof] in its original opinion was harmless error since the trial court affirmed the [board's] decision that applied the appropriate burden of proof, and the error had no effect on the outcome of this case."); *Campbell v. Department of Environmental Resources*, 396 A.2d 870 (Pa. Cmwlth. 1979) ("It is axiomatic that we will not disturb a judgment, order, or decree on appeal for harmless error. *Paley v. Trautman*, [177 A. 819, 820 (Pa. 1935).]")

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Southpointe Medical Associates, L.P.,   :
  :
              Appellant  : No. 247 C.D. 2020
  : No. 248 C.D. 2020
              v.  : No. 268 C.D. 2020
  :
Board of Supervisors for Township of   :
Cecil, Pennsylvania   :

# **O R D E R**

AND NOW, this 13<u>th</u> day of <u>July</u>, 2021, the order of the Washington County Court of Common Pleas dated February 7, 2020, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge